UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ADOLPH LEWIS, LATRELL LEWIS, MELISSA
LEWIS, and MELESHIA LEWIS,

                              Plaintiffs,

            -against-

THE CITY OF NEW YORK; NEW YORK CITY
POLICE DEPARTMENT ("NYPD") INSPECTOR
JOSEPH GULOTTA; LIEUTENANT JOEL
ROSENTHAL; LIEUTENANT JOHN HOPKINS;
SERGEANT DAVID ZAYAS; SERGEANT RYAN
HABERMEHL; POLICE OFFICER CHRISTIAN
VILLACIS, SHIELD #005464; POLICE OFFICER
ANTHONY BLUM, SHIELD NO. 20360; POLICE
OFFICER JOSE DELGADO; POLICE OFFICER
WILLIAM PUGLIESE; POLICE OFFICER JOSEPH
CALABRESE; POLICE OFFICER CAROLYN
NITOWITZ; and NYPD MEMBERS JOHN AND
JANE DOES NOS. 1-7; individually and in their
official capacities,

                              Defendants.

**FIRST AMENDED COMPLAINT
AND DEMAND FOR JURY
TRIAL**

**20-CV-1592 (PKC)(PK)**

**ECF CASE**

---

Plaintiffs, by counsel, GIDEON ORION OLIVER, as and for Plaintiffs' First Amended

Complaint against Defendants, hereby allege as follows:

## PRELIMINARY STATEMENT

1.     Plaintiffs bring this action for compensatory damages, punitive damages, and

attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, for violations of their civil

rights, as secured by said statutes and the Constitution of the United States.

## JURISDICTION AND VENUE

2.     This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the

Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

3.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

4.     Venue is proper pursuant to 28 U.S.C. §1391(b) in that Plaintiffs' claims arose in the Eastern District of New York.

## PARTIES

5.     Plaintiffs ADOLPH LEWIS, LATRELL LEWIS, MELISSA LEWIS, and MELESHIA LEWIS are all members of the same family, who were, at all times relevant herein, African-American residents of the Borough of Brooklyn, New York City, New York State.

6.     THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York 10007.

7.     The City is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement, and the City is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

8.     At all times relevant herein, Defendants NYPD INSPECTOR JOSEPH GULOTTA; LIEUTENANT JOEL ROSENTHAL; LIEUTENANT JOHN HOPKINS; SERGEANT DAVID ZAYAS; SERGEANT RYAN HABERMEHL; POLICE OFFICER CHRISTIAN VILLACIS, SHIELD NO. 05464; POLICE OFFICER ANTHONY BLUM, SHIELD NO. 20360; POLICE OFFICER JOSE DELGADO; POLICE OFFICER WILLIAM PUGLIESE; POLICE OFFICER JOSEPH CALABRESE; POLICE OFFICER CAROLYN NITOWITZ; and NYPD MEMBERS JOHN AND JANE DOES NOS. 1-7, were officers,

employees, and agents of the NYPD who were personally involved in depriving Plaintiffs of Plaintiffs' rights, as set forth more fully below.

9.     At all times hereinafter mentioned the Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

10.     Each and all of the acts of the Defendants alleged herein were done by said Defendants while acting within the scope of their employment by the Defendant City.

11.     Each and all of the acts of the Defendants alleged herein were done by said Defendants while acting in furtherance of their employment by the Defendant City.

12.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

13.     Each individual Defendant is sued in her or his individual and official capacities.

### <u>STATEMENT OF FACTS</u>

14.     On March 29, 2017, Plaintiffs - Adolph Lewis and three of his children- lived together, with Mr. Lewis's seven young grandchildren, inside a private, residential apartment located at 136 East 52nd Street, Brooklyn, NY  11203.

15.     As of March 2017, Mr. Lewis had lived there for around 18 years.

16.     Upon information and belief, on March 22, 2017, Defendant NYPD Police Officer Anthony Blum presented an affidavit and testimony to a Kings County Justice Hon. James P. Sullivan, based on which, also on March 22, 2017, Justice Sullivan signed a "NO-KNOCK" search  warrant authorizing NYPD members to search the Lewis's apartment for potential evidence such as credit cards, computers, cellphones, and the like; and further

authorizing NYPD members, while in the apartment, to search Adolph Lewis and/or Melesha Lewis for such property.

17.     The warrant did not authorize the search for, or seizure of, property outside the Lewis's apartment, such as Adolph Lewis's car.

18.     Defendants subsequently created a "Tactical Plan" (or "TAC Plan") related to executing the warrant.

19.     According to the TAC Plan, NYPD Emergency Service Unit ("ESU") members – sued herein as John and/or Jane Does 1-3 – were to "make entry to the location."

20.     According to the TAC Plan, Defendant NYPD Inspector Joseph Gulotta was the "Ranking Officer in Charge" and was not supervised by any superior NYPD members.

21.     According to the TAC Plan, Defendant NYPD Sergeant David Zayas was the "Field Intelligence Officer" and "Search Supervisor" and he was supervised by Inspector Gulotta.

22.     According to the TAC Plan, Defendant Blum was "Point Man", Defendant Police Officer Jose Delgado was "ESU/Vehicle Security", and they were both supervised by Defendant Zayas.

23.     According to the TAC Plan, Defendants Lieutenants Joel Rosenthal and John Hopkins were assigned as "Exterior Supervisors" and they were both supervised by Defendant Gulotta.

24.     According to the TAC Plan, Defendants Police Officers Christian Villacis and William Pugliese were assigned to "East 42 Security" and "Driveway Security", respectively, and they were supervised by Defendant Zayas.

4

25.     According to the TAC Plan, Defendants Police Officer Joseph Calabrese and Sergeant Ryan Habermehl were assigned to "Rear Security" with Hamerbehl supervising Calabrese and Defendant Rosenthal supervising Habermehl.

26.     According to the TAC Plan, Defendant Police Officer Carolyn Nitowitz was assigned to "Female Prisoner Security" with Defendant Habermehl supervising.

27.     According to the TAC Plan, NYPD Police Officers John and/or Jane Does 4-5 were assigned to "Hospital Auto" and supervised by Defendant Hopkins.

28.     Defendants John and/or Jane Does 6-7 are NYPD members who, as described below, searched and seized Mr. Lewis's car.

29.     Defendants Gulotta, Rosenthal, Hopins, Zayas, Habermehl, Villacis, Blum, Delgado, Pugliese, Calabrese, Nitowitz, and Does 1-7 are referred to collectively as the "Warrant Execution Defendants."

**PLAINTIFF ADOLPH LEWIS**

30.     On the morning of March 29, 2017, before around 7:00AM, Mr. Lewis was helping some of his granddaughters get ready for school.

31.     At some time before around 7:00AM, Mr. Lewis walked out of his apartment to take the garbage downstairs.

32.     Mr. Lewis was walking down the stairs when he heard a loud banging on the front entrance to the building.

33.     While Mr. Lewis was still walking down the stairs toward the entrance of the building,  a number of the Warrant Execution Defendants stopped Mr. Lewis.

34.     Some of the NYPD members were wearing uniforms and some were in plain clothes.

35.     Some of the NYPD members had their guns drawn.

36.     One of the NYPD members asked Mr. Lewis which apartment he lived in and he told them.

37.     One of the NYPD members told Mr. Lewis they had a warrant to search Mr. Lewis's apartment.

38.     Mr. Lewis asked to see the purported warrant.

39.     The NYPD members refused to show Mr. Lewis the warrant they claimed they had.

40.     One NYPD member said words to the effect that his seeing the purported warrant was "not important."

41.      The NYPD members directed Mr. Lewis to continue descending the stairs and then rear-cuffed him in metal handcuffs.

42.     Mr. Lewis asked why he was being arrested, but the NYPD members did not tell him.

43.     Mr. Lewis remained rear-cuffed in the stairwell for around 45 minutes.

44.     During that period, Mr. Lewis asked why he was being handcuffed, and one NYPD member replied that they had a search warrant for the apartment.

45.     During that period, Mr. Lewis saw that the police had arrested some other people in the building, including a neighbor who lived downstairs in the basement and his girlfriend.

46.     During that period, Mr. Lewis asked neighbors to watch his grandchildren or to call other family members to take his grandchildren to school.

47.     During that period, Mr. Lewis saw first his son, Latrell Lewis; then his daughters, Meleshia and Melissa; and Melissa's daughter's father, "SR", being taken out of the building by NYPD members.

48.     NYPD members then escorted Mr. Lewis from the building and placed him in a marked NYPD van.

49.     Mr. Lewis saw NYPD members lead a male downstairs neighbor and his girlfriend out of the building in handcuffs.

50.     NYPD members then transported Mr. Lewis to the NYPD's 67th Precinct.

51.     At the NYPD's 67th Precinct, NYPD members searched Mr. Lewis and removed his car keys, house keys, and money.

52.     NYPD members then placed Mr. Lewis in a holding cell along with the male downstairs neighbor from the building who had also been arrested.

53.     Mr. Lewis remained in the holding cell for around eight hours.

54.     After around six to eight hours, Mr. Lewis was taken out of the cell.

55.     Mr. Lewis was then handed a copy of Summons No. 4434497383 sworn out by Defendant Villacis charging him with Unlawful Possession of Ammunition in violation of New York City Administrative Code ("NYCAC") Section 10-301(7).

56.     Mr. Lewis had not possessed any ammunition or gun.

57.     Neither Defendant Villacis, nor any other NYPD member, recovered ammunition from Mr. Lewis.

58.     The allegations in the Summons No. 4434497383 sworn out by Defendant Villacis to the effect that Mr. Lewis possessed any ammunition were false.

59.     As Mr. Lewis was about to leave the 67th Precinct, a NYPD member told Mr. Lewis that the NYPD had Mr. Lewis's car.

60.     Mr. Lewis asked the NYPD member, if the officers had a search warrant to cover his apartment, why had they seized his vehicle?

61.     The NYPD member did not respond to him.

62.     NYPD members then brought Mr. Lewis's car around to the front of the Precinct, and Mr. Lewis and his children (the other Plaintiffs) left the Precinct.

63.     Upon returning to the apartment, Mr. Lewis saw that the front door to the apartment, as well as Melissa Lewis's bed, were damaged.

64.     Upon returning to the apartment, Mr. Lewis saw that the apartment had been in sum and substance ransacked by police.

65.     Mr. Lewis hired an attorney to represent him in connection with Summons No. 4434497383 sworn out by Defendant Villacis.

66.     Upon information and belief, Summons No. 4434497383 was dismissed on or before June 7, 2017 on grounds consistent with Mr. Lewis's innocence.

67.     After the arrest, Mr. Lewis began having flashbacks of the arrest.

68.     Mr. Lewis still wonders why he was arrested and embarrassed, in front of his entire family and his neighbors.

**PLAINTIFF LATRELL LEWIS**

69.     On March 29, 2017, Mr. Lewis was a 12th Grade student.

70.     At around 6:30AM on March 29, 2017, Mr. Lewis was sleeping in the bedroom in his family's apartment, with two of his younger nieces, when he was awakened by around three uniformed NYPD members forcibly entering the bedroom with their guns drawn.

71.     The NYPD members ordered Mr. Lewis to get on the floor, which he did.

72.     The NYPD members immediately handcuffed Mr. Lewis behind his back.

73.     The NYPD members then assisted Mr. Lewis to his feet and led him out of the bedroom and into the living room.

74.     In the living room, Mr. Lewis encountered several of his family members and around seven other uniformed NYPD members, including at least two who had their guns drawn.

75.     After some time, NYPD members removed Mr. Lewis from the apartment.

76.     NYPD members eventually transported Mr. Lewis to the 67th Precinct in a marked NYPD vehicle.

77.     NYPD members then placed Mr. Lewis in a holding cell at the 67th Precinct.

78.     After several hours, Mr. Lewis was released from the 67th Precinct.

79.     Mr. Lewis was handed a copy of Summons No. 4434497498 sworn out by Defendant Villacis charging him with Unlawful Possession of Ammunition in violation of New York City Administrative Code ("NYCAC") Section 10-301(7).

80.     Mr. Lewis had not possessed any ammunition or gun.

81.     Neither Defendant Villacis, nor any other NYPD members, recovered ammunition from Mr. Lewis.

82.     The allegations in the Summons No. 4434497498 sworn out by Defendant Villacis to the effect that Mr. Lewis possessed any ammunition were false.

83.     When Mr. Lewis returned to the apartment, Mr. Lewis saw that the front door to the apartment, as well as Melissa Lewis's bed, were damaged.

84.     Adolph Lewis hired an attorney to represent Mr. Lewis in connection with Summons No. 4434497498 sworn out by Defendant Villacis.

85.     Upon information and belief, Summons No. 4434497498 was dismissed on or before June 7, 2017 on grounds consistent with Mr. Lewis's innocence.

86.     Mr. Lewis missed school on March 29, 2017 as a result of his arrest and detention.

87.     Mr. Lewis also missed school to attend court.

88.     Mr. Lewis was frightened and suffered other emotional distress as a result of his arrest, detention, and prosecution.

**PLAINTIFF MELESHIA  LEWIS**

89.     At around 6:00AM on March 29, 2017, Plaintiff Meleshia Lewis was lying in her bedroom with her two-year-old daughter when she saw and heard NYPD members knock the door to the apartment in without warning.

90.     Around at least 7 NYPD members entered the apartment, some of whom had firearms drawn.

91.     Two NYPD members then entered Ms. Lewis's bedroom.

92.     Ms. Lewis and her daughter were in Ms. Lewis's bed.

93.     One of the NYPD members pointed a firearm at Ms. Lewis's two-year-old daughter.

94.     Ms. Lewis's daughter was crying.

95.     Ms. Lewis told the NYPD members that her daughter was in the room with her.

96.     The NYPD member who had pointed the firearm at Ms. Lewis's daughter then pointed the gun away from her.

97.     The NYPD members handcuffed Ms. Lewis, who was still in her bed, behind her back.

98.     A female NYPD member then entered the room so that Ms. Lewis, who was wearing only underwear and a t-shirt, could change her clothes.

99.     Ms. Lewis was then led out of the room by the female NYPD member to the living room, where she saw her other family members.

100.    NYPD members told Ms. Lewis to sit down, and she sat down on the couch.

101.    Ms. Lewis remained on the couch for around an hour.

102.    Ms. Lewis asked the NYPD members to see a search warrant.

103.    The NYPD members responded in sum and substance that they did not have to show her anything.

104.    As Ms. Lewis sat on the couch, the NYPD member were not searching the apartment.

105.    As Ms. Lewis and other family members were in the living room, a NYPD member mocked the then-recent death of Ms. Lewis's mother.

106.    After around an hour, NYPD members removed Ms. Lewis from the building.

107.    NYPD members then placed Ms. Lewis in a marked NYPD car.

108.    NYPD members then transported Ms. Lewis to the NYPD's 67th Precinct.

109.    At the 67th Precinct, Ms. Lewis was then placed in a holding cell.

110.    Ms. Lewis remained in the holding cell for around six hours.

111.    After around six hours, two male NYPD members took Ms. Lewis from the holding cell into a separate room for questioning.

112.    At no time did the NYPD members read Ms. Lewis any *Miranda* warnings.

113.    The NYPD members questioned Ms. Lewis about a Visa credit card that she had never seen before.

114.    After questioning Ms. Lewis for around 15 minutes, the NYPD members brought her back to her cell.

115.    After around five minutes, Ms. Lewis was released from the holding cell.

116.    Ms. Lewis was handed a copy of Summons No. 4434497470 sworn out by Defendant Villacis charging her with Unlawful Possession of Marijuana in violation of New York Penal Law Section 221.05.

117.    Ms. Lewis had not possessed any marijuana.

118.    Neither Defendant Villacis, nor any other NYPD officer, recovered marijuana from Ms. Lewis.

119.    The allegations in the Summons No. 4434497470 sworn out by Defendant Villacis to the effect that Ms. Lewis possessed any marijuana were false.

120.    As a result of Ms. Lewis's detention on March 29, 2017, Ms. Lewis missed work that day.

121.    When Mr. Lewis returned to the apartment, Ms. Lewis saw that the front door to the apartment, as well as Melissa Lewis's bed, were damaged.

122.    Ms. Lewis also saw that everything in her room was "flipped upside down."

123.    Adolph Lewis hired an attorney to represent Ms. Lewis in connection with Summons No. 4434497470 sworn out by Defendant Villacis.

124.    Ms. Lewis was required to make two appearances in connection with Summons No. 4434497470 sworn out by Defendant Villacis.

125.    Summons No. 4434497470 was dismissed on September 19, 2017 on grounds consistent with Claimant's innocence.

126.    Ms. Lewis missed work to appear in court.

12

### PLAINTIFF MELISSA LEWIS

113.    On the morning of March 29, 2017, Plaintiff Melissa Lewis was sleeping in her room with her door closed with her three young daughters and their father, a non-party whose initials are "SR".

114.    Ms. Lewis heard banging and noise, so she opened the door.

115.    When Ms. Lewis opened the door, she observed around 10 or more NYPD members.

116.    Some of the NYPD members were uniformed and some of whom were in plainclothes.

117.    Some of the NYPD members had guns drawn.

118.    When Ms. Lewis opened the door, a NYPD member or members directed her to get down on the floor.

119.    Ms. Lewis remained standing.

120.    An NYPD member then stated that they had a warrant.

121.    Ms. Lewis asked about the warrant including what the warrant was for.

122.    No NYPD member answered Ms. Lewis or showed Ms. Lewis a warrant.

123.    Ms. Lewis's children were in the adjacent room.

124.    Ms. Lewis then said that her kids were in the adjacent room.

125.    An NYPD member then told Ms. Lewis that she was under arrest.

126.    The NYPD member physically took control of Ms. Lewis and rear-cuffed her.

127.    Ms. Lewis's children watched police arrest their mother.

128.    The NYPD member sat Ms. Lewis down in the living room.

129.    There Ms. Lewis remained for around 30 minutes.

130.    During that time, Ms. Lewis saw NYPD members bring "SR"; Ms. Lewis's father, Adolph Lewis; and Ms. Lewis's brother, members Lewis, into the living room, in handcuffs.

131.    After around 30 minutes, NYPD members led Ms. Lewis out of the apartment and into a marked NYPD van.

132.    In the NYPD van with Ms. Lewis were "SR", her father Adolph, and her brother Latrell.

133.    NYPD members then took Ms. Lewis to the 67th Precinct.

134.    At the 67th Precinct, Ms. Lewis was placed into a holding cell by herself, where she remained for around six hours.

135.    During that around six-hour period, an NYPD member claimed that the police had obtained a search warrant for the apartment, and that they were getting ready to search it.

136.    After around six hours, Ms. Lewis was released from the holding cell.

137.    Ms. Lewis was handed a copy of Summons No. 4434497484 sworn out by Defendant Villacis charging her with Unlawful Possession of Marijuana in violation of New York Penal Law Section 221.05.

138.    Ms. Lewis had not possessed any marijuana.

139.    Neither Defendant Villacis, nor any other NYPD member, recovered marijuana from Ms. Lewis.

140.    The allegations in the Summons No. 4434497484 sworn out by Defendant Villacis to the effect that Ms. Lewis possessed any marijuana were false.

141.    At some time after arresting Ms. Lewis, NYPD members broke Ms. Lewis's bed.

142.    Ms. Lewis missed work as a result of her arrest and detention on March 29, 2017.

143.     Ms. Lewis appeared in court once in connection with Summons No. 4434497484 sworn out by Defendant Villacis.

144.     Ms. Lewis missed work to make that appearance.

145.     Upon information and belief, Summons No. 4434497498 was dismissed on June 7, 2017 on grounds consistent with Ms. Lewis's innocence.

## FIRST CLAIM FOR RELIEF

**FOR VIOLATIONS OF PLAINTIFFS' RIGHTS TO BE FREE FROM UNLAWFUL SEARCHES AND SEIZURES, RELATED PROPERTY DAMAGE, AND FALSE ARREST UNDER THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THROUGH 42 U.S.C. § 1983 - AGAINST THE WARRANT EXECUTION DEFENDANTS**

127.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

128.     As a result of Defendants' conduct as described above, Plaintiffs were subjected to illegal, improper, and false arrest by Defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege, or consent.

129.     Additionally, as described above, some of the Warrant Execution Defendants used unreasonable and excessive force against Plaintiffs in connection with executing the warrant.

130.     Additionally, as described above, some of the Warrant Execution Defendants caused unreasonable and unnecessary damage to Plaintiffs' property in connection with executing the warrant.

131.     For example, upon information and belief, NYPD members destroyed the door to Plaintiffs' apartment without authority or consent.

132.     For example, upon information and belief, NYPD members destroyed Ms. Lewis's bed without authority or consent.

133.   By way of additional example, upon information and belief, NYPD members in sum and substance ransacked Plaintiffs' apartment without authority or consent.

134.   Additionally, some of the Warrant Execution Defendants exceeded the scope of the warrant in searching and/or seizing Plaintiffs and Plaintiffs' property.

135.   For example, as described above, upon information and belief, Defendants Does 6-7 searched and seized Mr. Lewis's car and transported it to the NYPD's 67th Precinct without authority or consent.

136.   As a result of the foregoing, Plaintiffs were deprived of Plaintiffs' liberty and property, experienced stress, emotional injury, and humiliation, were forced to pay costs and expenses, and were otherwise damaged and injured.

## SECOND CLAIM FOR RELIEF

### FOR VIOLATIONS OF PLAINTIFFS' DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, THROUGH 42 U.S.C. § 1983 - AGAINST THE WARRANT EXECUTION DEFENDANTS

137.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

138.   Upon information and belief, Defendants Does 6-7 searched and seized Mr. Lewis's car and transported it to the NYPD's 67th Precinct without authority or consent.

139.   Defendants provided Plaintiffs with no pre- or post-deprivation process in connection with seizing Mr. Lewis's car or damaging Plaintiffs' property.

140.   As a result of the foregoing, Plaintiffs were deprived of Plaintiffs' liberty and property, experienced stress, emotional injury, and humiliation, were forced to pay costs and expenses, and were otherwise damaged and injured.

## THIRD CLAIM FOR RELIEF

**FOR VIOLATIONS OF PLAINTIFFS' FAIR TRIAL RIGHTS UNDER THE FIFTH, SIXTH, AND/OR FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THROUGH 42 U.S.C. § 1983 - AGAINST DEFENDANT VILLACIS**

141.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

142.    Defendant Villacis fabricated evidence of a material nature, likely to influence a jury's decision, and included that fabricated evidence in summonses charging each Plaintiff with offenses, as a result of which Plaintiffs suffered deprivations of liberty.

143.    That fabricated evidence included, but was not limited to, the allegations that Villacis seized marijuana and ammunition from Plaintiffs.

144.    As a result of the foregoing, Plaintiffs were deprived of Plaintiffs' liberty and property, experienced stress, emotional injury, and humiliation, were forced to pay costs and expenses, and were otherwise damaged and injured.

## FOURTH CLAIM FOR RELIEF

**FOR VIOLATIONS OF PLAINTIFFS' RIGHTS TO BE FREE FROM MALICIOUS PROSECUTION UNDER THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THROUGH 42 U.S.C. § 1983 - AGAINST DEFENDANT VILLACIS**

145.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

146.    Defendant Villacis misrepresented and falsified evidence in the summonses he swore out against Plaintiffs.

147.    Defendant Villacis withheld exculpatory evidence from the summonses he swore out against Plaintiffs.

148.     Defendants Villacis was directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiffs, including by supplying and creating false information in the summonses he swore out against Plaintiffs.

149.     Defendant Villacis lacked probable cause to initiate and continue criminal proceedings against Plaintiffs.

150.     Defendant Villacis acted with malice in initiating criminal proceedings against Plaintiffs.

151.     Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiffs were favorably terminated.

152.     As a result of the foregoing, Plaintiffs were deprived of Plaintiffs' liberty and property, experienced stress, emotional injury, and humiliation, were forced to pay costs and expenses, and were otherwise damaged and injured.

### FIFTH CLAIM FOR RELIEF

### FAILURE TO TRAIN AND SUPERVISE CLAIMS AGAINST DEFENDANT CITY OF NEW YORK

153.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

154.     All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to policies and practices of defendant City that were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant City and its agency, the NYPD.

155.    Defendant City and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual Defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

156.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the defendant City and the NYPD, all under the supervision of ranking officers of the NYPD.

157.    The City of New York, acting through the New York City Police Department and its agents, officers, and employees, has acted with deliberate indifference to the rights of the people of the City of New York to not be subjected to unconstitutional property damage during the execution of searches.

158.    Despite the obvious need to do so, the City has failed to train its police officers that the Fourth Amendment prohibits excessive and unnecessary damage during the execution of a search warrant.

159.    The City has known that NYPD officers routinely cause excessive or unnecessary property damage in the execution of a search.

160.    The City has known that NYPD officers do not understand the constitutional limitations on causing excessive or unnecessary property damage in the execution of a search.

161.    In the face of this continuing problem, the City has remained indifferent and failed to adequately train, supervise, and discipline NYPD officers to ensure that they do not cause excessive or unnecessary property damage in the execution of a search.

162.    As seen above, in searching the Plaintiffs' apartment, the defendant officers caused unreasonable and unnecessary damage to Plaintiffs' property.  This damage was the result of the deliberate indifference of the City of New York.

163.    "The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant" and "[e]xcessive or unnecessary destruction of property" during a search is unreasonable.  *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citation omitted).

164.    The need to train officers that excessive and unnecessary damage violate the Fourth Amendment is obvious, and the City's failure to ensure that its officers receive such training amounts to deliberate indifference to the constitutional rights of the people of the City of New York.

165.    The NYPD's Patrol Guide, which spans thousands of pages detailing hundreds of police procedures, including "search warrant execution" (Procedure 212-105), does not contain a statement or guideline that the Fourth Amendment prohibits excessive and unnecessary damage during the execution of a search warrant.

166.    The City has received numerous complaints about excessive and unnecessary damage caused by NYPD officers during home searches through notices of claims, lawsuits, complaints to the NYPD, and complaints to the Civilian Complaint Review Board.

167.    The City knows that many of its officers are unaware that there is a limit on damage that is permissible in the execution of a search.

168.    These problems, while obvious, were made clear in *McClary v. City of New York* et al., No. 12-cv-118 (E.D.N.Y.).

169.    In the *McClary* case, on June 25, 2013, then-Chief Judge Carol Bagley Amon permitted the plaintiff to add a *Monell* claim based on the City's failure to train its officers in the constitutional limit on damage during search warrant execution.

170.    The evidence adduced in the *McClary* case, which was presented to Judge Amon in support of the plaintiff's motion for leave to amend, included:

a.  Sgt. Sonia Christian's testimony that she had received no training during or after the Police Academy on how to condct a search of a house, but had been instructed that officers are allowed to search anywhere an object of the search may physically be located.

b.  Sgt. Christian's testimony that her understanding was that "when you're looking for a handgun, which is presumably a small object, virtually any space that can be opened up becomes fair game for the search."

c.  Officer Matthew Vorraro's testimony that he did not remember receiving any training at the Police Academy on how to search a house or any training at anytime on minimizing or how to minimize damage while executing a search warrant.

d.  Officer Mark Kipybida's testimony that he did not receive any training at the Police Academy on how to execute a search warrant; nor did he receive any training about minimizing damage during the execution of a search warrant.

e.  Lt. Andrew Hepworth's testimony that in his twenty-four years as an NYPD officer, the only training he could recall receiving on executing a search warrant was after he was promoted to sergeant, and that the training was only

given to "certain supervisors."  He did not testify that the training covered the issue of limiting damage during the execution of the search.

f.   Officer Gregory Michels's testimony that he did not receive any training at the Police Academy in how to execute a search warrant, did not receive any training at the Police Academy on minimizing damage during the execution of a search warrant, and did not receive any training after graduating from the Academy on how to execute a search warrant.

g.   Captain Craig Adelman's testimony that he was not aware of any guidelines, instructions, or training that explained that property damage should be minimized during the execution of search warrants.

h.   Officer Ronald Schmidt's testimony that he did not receive any training on how to execute a search warrant.

171.   Additional evidence adduced in the the *McClary* case demonstrated that NYPD officers are not properly trained, supervised, or disciplined regarding the limitation on damage during the execution of search warrants.

172.   On September 24, 2013, NYPD Chief John Essig testified in a deposition on behalf of the City of New York pursuant to Fed. R. Civ. P. 30(b)(6) regarding the NYPD's policies on how officers are instructed to execute search warrants.

173.   Chief Essig testified to the following facts:

a.   He knew of no Patrol Guide provision or training materials that explained the constitutional standard that only reasonable damage was permitted during search warrant execution;

22

b. He did not believe there is a limitation on damage that is permissible in the execution of a search (he later amended his testimony to say that "the rule of thumb is the reasonableness of the damage necessary to do it, to conduct a search is really the guideline that we instruct officers," but he acknowledged that he only arrived at this clarification during a break in which he "spoke to counsel who said I might have misunderstood [the] question");

c. The only training materials addressing the execution of search warrants that are provided to police officers describe what officers can look for and where they can look, but do not provide an explanation on how the search should be carried out;

d. In the training materials he had reviewed to prepare for his deposition, he found no discussion about the limitation on damage that is acceptable during the execution of a search warrant;

e. There are no materials given to new recruits at the Police Academy and no classroom instruction provided to new recruits that explain there are limitations on damage that can be caused during the execution of a search warrant;

f. There is no training provided at the Academy for new recruits on the manner of executing search warrants;

g. There is no classroom training for new supervisors about the manner in which search warrants should be executed;

h. He had seen no lesson plans for instruction, either for recruits or supervisors, about the manner in which search warrants should be executed;

      i.   Officers are trained that they can look anywhere they thought a piece of evidence could be, which included looking inside a couch; and

      j.   He was not aware of any officer who had been disciplined for problems during the execution of a search warrant.

174.    Upon information and belief, following the *McClary* case, and before the search of the Plaintiffs' apartment, the City did not amend the Patrol Guide to include a statement or guideline about the constitutional limitation on property damage during the execution of search warrants.

175.    Upon information and belief, following the *McClary* case, and before the search of the Plaintiffs' apartment, the City did not implement training so that its police officers would know that the constitution prohibits excessive and unnecessary damage during the execution of search warrants.

176.    Upon information and belief, following the *McClary* case, and before the search of the Plaintiffs' apartment, the City did not implement policies to ensure that NYPD officers are properly supervised in the manner of executing search warrants to ensure that excessive and unnecessary property damage is not caused.

177.    Upon information and belief, following the *McClary* case, and before the search of the Plaintiffs' apartment, the City did not implement policies to ensure that NYPD officers are disciplined if they cause excessive or unnecessary property damage while executing search warrants to ensure that such damage is not caused.

178.    The damage to the Plaintiffs' property is of the kind seen in the *McClary* case and other cases where NYPD officers have caused unnecessary damage during the execution of a search warrant.

179.    The damage to Plaintiffs' property was caused by the City's failure to properly train its officers and/or its practice of causing excessive and unnecessary property damage during search warrant execution.

180.    The City has also failed to supervise properly its officers and to discipline officers who cause excessive or unnecessary damage while executing searches, including, but not limited to, Defendant Villacis.

181.    Despite its awareness of numerous complaints against Defendant Villacis, the City and the NYPD have remained indifferent and failed to adequately supervise or discipline him to ensure that they he does not violate the constitutional rights of people of the City of New York.

182.    For example, Defendant Villacis was also sued in *Chislom et al. v. City Of New York, et al.*, Kings County Index No. 513641/2016, a case that included claims similar to Plaintiffs' fabrication of evidence claims in this case, which resulted in a $75,000 settlement.

183.    For example, Defendant Villacis is also a Defendant in *John-Huggins v. City Of New York, et al.*, Kings County Index No. 515104/2018, a case that includes claims similar to Plaintiffs' unlawful search and seizure claims in this case, which is ongoing.

184.    The City of New York, acting through the New York City Police Department and its agents, officers, and employees, has acted with deliberate indifference to the rights of the people of the City of New York to not be subjected to unconstitutional conduct by Defendant Villacis.

185.    The City's deliberate indifference was the moving force of the unconstitutional property damage complained of herein.

186.    As a result of the foregoing, Plaintiffs were deprived of Plaintiffs' liberty and property, experienced stress, emotional injury, and humiliation, were forced to pay costs and expenses, and were otherwise damaged and injured.

## JURY DEMAND

187.    Plaintiffs demand a trial by jury in this action of all issues pursuant to Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for the following relief:

A.    Compensatory damages against the Defendants jointly and severally;

B.    Punitive damages against the individual Defendants;

C.    Attorney's fees and costs pursuant to 42 USC §1988; and

D.    Such other and further relief as the Court deems just and proper.

DATED:    Brooklyn, New York
February 16, 2021

Respectfully submitted,

_____
Gideon Orion Oliver
*Attorney for Plaintiffs*
1825 Foster Avenue, Suite 1K
Brooklyn, NY  11230
718-783-3682